**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**AMY JANE HODGE,**

        **Plaintiff,**

**v.**                            **Case No.: 3:10-cv-1419**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

        **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos. 10 and 13). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 11 and 12).

The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   Procedural History

Plaintiff, Amy Jane Hodge (hereinafter referred to as "Claimant"), filed for DIB and SSI benefits on September 18, 2008, alleging disability due to chronic back pain and bipolar disorder. (Tr. at 164). The Social Security Administration ("SSA") denied the application initially on December 16, 2008 and upon reconsideration on April 20, 2009. (Tr. at 56–59). On May 6, 2009, Claimant filed a written request for a hearing before an Administrative Law Judge ("ALJ"). The administrative hearing was held on October 29, 2009 before the Honorable Charlie Paul Andrus. (Tr. at 32–55). At the hearing, Claimant requested that she be evaluated by consultative examiners. (Tr. at 53). The ALJ approved Claimant's request and scheduled a supplemental hearing to consider the opinions of consultative examiners. The supplemental hearing was held on February 25, 2010. (Tr. at 22–31). By decision dated April 6, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 8–21).

The ALJ's decision became the final decision of the Commissioner on October 26, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-4). On December 28, 2010, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on April 4, 2011. (Docket Nos. 7 and 8). The parties filed their briefs in support of judgment on the pleadings. (Docket Nos. 10 and 13). Therefore, this matter is ripe for resolution.

## II.   Claimant's Background

Claimant was 45 years old at the time of her alleged disability onset date. (Tr. at 36). Claimant did not finish high school but later obtained a GED. (Tr. at 37). Claimant also received training as a Certified Nursing Assistant. (*Id.*).

III.   <u>**Relevant Medical Records**</u>

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of her medical background.

A.   **Treatment Records—Prior to the Alleged Disability Onset Date**

On February 23, 2007, Claimant presented to Prestera Centers for Mental Health (Prestera) for psychiatric assessment and care. (Tr. at 243-44). She was interviewed and evaluated by Leasha D. Trimble, MA. Claimant reported having recent thoughts of suicide, although she had no specific plan or intent. She also reported mild symptoms of violence and irritability; difficulty getting up in the morning to shower and perform personal care; and self-injury through itching and scratching rashes. (*Id.*). Her moderate symptoms included distractibility, change in appetite, alternating insomnia and hypersomnia, loss of interest in daily activities, hostility, social withdrawal, impulsivity, poor judgment, poor concentration, depression, anxiety, decreased energy, and hopelessness. (*Id.*). Ms. Trimble did not find evidence of any severe symptoms. (*Id.*). Claimant described having occasional panic attacks, social phobia of crowds, and periods of mania and hyperactivity. (*Id.*). She indicated that she had a young grandchild for whom she often was forced to provide care and stated that she did not like to have this burden. (*Id.*). Further, Claimant complained of low energy and difficulty performing daily chores in addition to caring for her grandchild, which resulted in frequent bickering with her daughter. (Tr. at 243). Despite this tension, Claimant identified her support system as including her mother, sister, and daughter. (Tr. at 244). Ms. Trimble assessed Claimant with irritability and mild oppositional behavior, which presented as a

resistance to help from others. (*Id.*). Claimant expressed a willingness to receive therapy because her problems with stress and impulsivity were affecting her interpersonal relationships and quality of life. (*Id.*).

On June 20, 2007, Claimant was seen for an initial psychiatric evaluation by Dr. Claire Belgrave, a treating psychiatrist at Prestera. (Tr. at 252–53). Dr. Belgrave confirmed Claimant's history of depression, irritability, and insomnia. (Tr. at 252). Claimant also reported a history of drug and alcohol abuse but stated that she had been sober for 7-10 years. (*Id.*). Dr. Belgrave diagnosed Claimant with bipolar disorder, with a comment to rule-out post traumatic stress disorder. She determined Claimant's Global Assessment of Functioning (GAF) to be 60.[1] Dr. Belgrave observed that Claimant was not currently suicidal and prescribed Zoloft to alleviate her symptoms of depression. (Tr. at 253). On July 18, 2007, Claimant returned to Prestera to begin psychotherapy with Ms. Trimble. (Tr. at 245–46). Claimant advised that her ex-husband had returned to her home because he had "nowhere else to go;" therefore, Claimant was spending most of the time at her mother's house. (Tr. at 245). Ms. Trimble recorded that Claimant had been working regularly at the Dollar Store in Kenova but her irritability and depression had affected her work performance. (*Id.*). Ms. Trimble expressed concern over a lack of boundaries with Claimant's ex-husband and Claimant's irritability and depression at work. (*Id.*).

On August 7, 2007, Claimant was seen by David Whitmore, DO, at Valley Health Associates with complaints of a pruritic rash on her hands. (Tr. at 533). Claimant

---

[1] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100; as the score increases, the severity of psychological dysfunction decreases. This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV-Text Revision.* A score of 51-60 indicates moderately severe symptoms OR moderate difficulty in social, occupational, or school functioning.

informed Dr. Whitmore that she had been diagnosed with bipolar disorder and had been suffering from lower back pain. (*Id.*). On September 7, 2007, Claimant was seen at Prestera by Tammy Chaney[2] for an updated multiaxial assessment. (Tr. at 234–241). Claimant's impulsivity, poor judgment, suspiciousness, panic symptoms, manic periods, and change in appetite were all found to be mild. (Tr. at 235–36). Claimant's hostility, withdrawal, poor concentration, depression, guilty, anxiety, feelings of hopelessness, low energy, distractibility, insomnia, and loss of interest in activities were all thought to be moderate. (*Id.*). Ms. Chaney noted that Claimant took her medications on a regular basis, but they were not entirely effective. (Tr. at 238). Claimant was able to perform her activities of daily living; maintain relationships; self administer medications; and maintain personal safety with minimal assistance. (Tr. at 239). In conclusion, Ms. Chaney reconfirmed Claimant's diagnosis of bipolar disorder and rated her GAF at 55. (Tr. at 240–41).

On September 27, 2007, Claimant was seen at Valley Health Associates with complaints of a persistent cough and ear aches. (Tr. at 532). Claimant also reported suffering from lower back pain. (*Id.*). On October 10, 2007, Claimant returned to Prestera for therapy with Jack Williams, Clinician. (Tr. at 249–50). Claimant stated that she continued to have problems at work due to her irritability with others and that she was experiencing a lot of stress at home because her terminally ill grandmother was living with her. (Tr. at 249). Mr. Williams noted that Claimant lacked the ability to let go of anger towards other and was unwilling to have therapy more than once a month. (*Id.*). Claimant reported that she took her prescribed medications regularly and had not experienced any negative side effects. (Tr. at 256).

---

[2] Ms. Chaney's professional qualifications were not included in the record.

On October 28, 2007, Claimant was admitted to the emergency room at Cabell Huntington Hospital with complaints of a severe and persistent headache. (Tr. at 502–17). Claimant was examined by David Hinchman, MD. Dr. Hinchman noted that Claimant was experiencing parethesias in her left face, which Claimant described as a tingling numbness. (Tr. at 503). Claimant reported smoking three packs of cigarettes per day. (*Id.*). A CT scan of Claimant's head showed no abnormality of the brain or calvarium. (Tr. at 518). The reviewing radiologist noted that the ventricles were normal in size and that there was no evidence of intracranial hematoma or hemorrhage. (*Id.*). Dr. Hinchman diagnosed Claimant as suffering from a migraine or tension headache. (Tr. at 504).

On December 3, 2007, Claimant returned to Dr. Whitmore at Valley Health Associates for complaints of right ear pain. (Tr. at 531). Claimant reported that her depression had worsened and that she continued to smoke several packs of cigarettes per day. (*Id.*). Claimant described experiencing a generalized arthralgia and myalgias that a friend told her might be fibromyalgia. (*Id.*). Dr. Whitmore diagnosed Claimant as suffering from myalgias with arthralgias, depression, and a smoking addiction. (*Id.*).

On February 26, 2008, Claimant was admitted to the emergency room at the King's Daughters Medical Center with complaints of chest pain and a sore throat. (Tr. at 258–70). Claimant was diagnosed with acute bronchitis and acute atypical chest pain. (Tr. at 258–60). A chest x-ray revealed no consolidation or pleural effusion. (Tr. at 270). Claimant returned to the emergency room at Cabell Huntington Hospital on March 15, 2008, with ongoing complaints of chest pain. (Tr. at 461–77). Claimant's differential diagnosis was atypical chest pain versus myocardial infarction. (Tr. at 462–63). An x-ray of Claimant's chest was normal with no change from the x-ray taken on December 8,

2006. (Tr. at 482–83). A nuclear myocardial perfusion study and stress test were negative for abnormalities. (Tr. at 483-86). She was discharged in stable condition with a final diagnosis of chest pain.

Claimant presented to the emergency room at Cabell Huntington Hospital on April 18, 2008 with complaints of pain and swelling in her ribs and torso. (Tr. at 420–41). Claimant reported that she injured herself at work two days prior to her admission to the emergency room and that her pain was constant. (Tr. at 421). Claimant further stated that any type of movement exacerbated her pain. (*Id.*). An x-ray of Claimant's ribs and chest were taken and revealed no evidence of acute cardiopulmonary problems. (Tr. at 442). No significant changes were noted from Claimant's chest x-ray from December 31, 2006. (*Id.*). Claimant was discharged with a diagnosis of chest wall pain.  She returned to the emergency room at Cabell Huntington Hospital a couple of weeks later with new complaints of chest pain. (Tr. at 395–418). Claimant reported that the onset of chest pain occurred three days prior to her admission. (Tr. at 395). A physical examination revealed no abnormalities. An x-ray of Claimant's chest showed no active pulmonary or cardiac disease. (Tr. at 419). Claimant was diagnosed with chest pain, treated with nitroglycerin and aspirin, and discharged in stable condition. (Tr. at 395–97).

**B.     Treatment Records—Relevant Time Period**

On July 10, 2008, Claimant was admitted to the emergency room at Cabell Huntington Hospital with complaints of left arm pain. (Tr. at 370–89). Claimant was diagnosed with left arm pain and provided educational materials regarding bursitis. (Tr. at 372). Peter Chirico, MD, reviewed Claimant's chest x-ray and found a normal cardiac size; some vague density present at the lateral left lung base; an old right posterior

eighth rib fracture; and minimal left basilar atelectasis or pneumonia. (Tr. at 390). Claimant also underwent a stationary electrocardiogram, which was electronically read as including "sinus rhythm," "nonspecific T wave abnormality," and "abnormal ECG." (Tr. at 390–94).

On August 8, 2008, Claimant returned to Valley Health Associates for a follow-up appointment with Dr. Whitmore. (Tr. at 529, 589). Claimant reported that she was generally doing well but had complaints of facial neuropathy, heartburn, and dyspepsia. (Tr. at 529). Dr. Whitmore remarked that a CT scan from the previous year was unremarkable. (*Id.*). Dr. Whitmore diagnosed Claimant as suffering from dyspepsia, acid reflux, left-sided facial neuropathy, and diabetes mellitus. (*Id.*). The following day, on August 9, 2008, Claimant was admitted to the emergency room at Cabell Huntington Hospital with complaints of paresthesia and left-sided facial numbness. (Tr. at 353–69). Claimant stated that the numbness had been occurring intermittently over the previous month and that the onset was gradual. (Tr. at 353). Claimant was diagnosed with numbness of the face and provided with educational materials regarding paresthesias. (Tr. at 354). On August 14, 2008, Marsha Anderson, MD, at Tri State MRI reviewed an MRI of Claimant's brain without contrast and found that the MRI results were normal. (Tr. at 540, 596). On August 30, 2008, Claimant returned to the emergency room at Cabell Huntington Hospital with complaints of intermittent dizziness and increased blood pressure over the previous week. (Tr. at 324–46). Claimant also reported persistent numbness in the left side of her face. (Tr. at 324). Subsequently, Claimant was diagnosed with hypertension. (Tr. at 326). An EKG of Claimant's heart revealed a sinus rhythm and non-specific T wave abnormality. (Tr. at 348).

On September 8, 2008, Claimant was seen by Wen Long, MD, at the CHH

Regional Center for Women's Health for routine follow-up of two small esophageal lesions that had been biopsied in 2003. (Tr. at 296–98). Claimant admitted that she had been instructed to follow up with an esophagogastroduodenoscopy (EGD) every year but had failed to do so. (*Id.*). Dr. Long performed a diagnostic EGD on Claimant and found a small polyp in Claimant's mid esophagus, which was determined on biopsy to be benign. (Tr. at 299–304).

On September 12, 2008, Claimant returned to Valley Health Associates for a follow-up appointment with Dr. Whitmore. (Tr. at 527–28, 587–88). Claimant stated that she was generally doing well but had been more anxious than usual lately and was no longer attending therapy at Prestera. (Tr. at 527). Claimant denied any suicidal ideation. (*Id.*). Dr. Whitmore found that Claimant continued to suffer from dyspepsia, acid reflux, facial neuropathy, diabetes mellitus, dyslipidemia, depression with some anxiety, and elevated blood pressure. (*Id.*). In light of the unremarkable MRI of Claimant's brain, Dr. Whitmore hypothesized that Claimant's facial neuropathy was probably the result of nerve irritation. (*Id.*). Further, Dr. Whitmore noted that Claimant's diabetes was well controlled. (*Id.*). Dr. Whitmore also found that Claimant's dyslipidemia was uncontrolled for a diabetic and reminded her to take her medication on a regular basis. (*Id.*). Dr. Whitmore noted Claimant's "questionable" history of bipolar disorder and encouraged Claimant to continue treatment at Prestera. (Tr. at 527).

On September 15, 2008, Claimant was admitted to the emergency room at St. Mary's Medical Center with complaints of persistent back pain radiating down into her legs. (Tr. at 616–18). Claimant reported that her back pain started two weeks earlier and that nothing relieved the burning sensation in her back. (Tr. at 616). An x-ray of

Claimant's lumbar spine showed signs of mild degenerative changes of the lower lumbar spine. (Tr. at 620). Specifically, the radiologist noted mild disc space height loss at the L5-S1 level but found that disc space height, intervertebral space, and spinal alignment were otherwise maintained. (*Id.*). The examining physician diagnosed Claimant with chronic lower back pain and provided Lortab to alleviate the pain. (Tr. at 617). Several days later, on September 19, 2008, Claimant returned to the emergency room at Cabell Huntington Hospital complaining of lower back pain. (Tr. at 275–92). Claimant described experiencing severe pain in the area of her lumbar spine that occasionally radiated down into her left leg. (Tr. at 275). Lori K. Bennett, MD, examined Claimant and noted that Claimant had an antalgic gait. (*Id.*). Claimant stated that rest, ice, heat, and analgesics helped alleviate the pain. (*Id.*). A CT scan of Claimant's lumbar spine revealed a mild disc bulge at L5-S1, but no evidence of obvious canal stenosis and no fractures or subluxation. (Tr. at 293). Claimant was diagnosed as suffering from chronic back pain and provided education materials regarding acute or chronic back pain. (Tr. at 277).

On October 3, 2008, Dr. Whitmore performed a physical examination of Claimant at the request of West Virginia's Disability Determination Section (DDS) and submitted a routine abstract form detailing the examination. (Tr. at 522–26). The form noted that Claimant's disability claim was based on allegations of: back pain, an esophageal tumor, high cholesterol, bipolar disorder, and depression. (Tr. at 522). On examination, Dr. Whitmore found that Claimant's vision, hearing, speech, musculoskeletal system, neurological functioning, respiratory system, cardiovascular system, and digestive system were all normal. (Tr. at 523–25). He commented that Claimant failed to take her medications as prescribed. Dr. Whitmore provided no

opinion regarding Claimant's ability to engage in work-related activities. (Tr. at 526).

On January 21, 2009, Claimant returned to Prestera to resume mental health treatment. (Tr. at 597–606). Stacy Flynn, Clinician, provided an updated assessment of Claimant. (Tr. at 605–06). Claimant reported that she was depressed and had regular thoughts of suicide but denied any plan or intent. (Tr. at 605). According to Claimant, she was uncomfortable around others, including her family, and often felt very hostile towards them. (*Id.*). Claimant reported neglecting self-care and struggling with panic attacks and anxiety. (*Id.*). She stated that she was socially withdrawn, had little energy, an increase in appetite, difficulty sleeping, and a lack of interest in activities. (*Id.*). Claimant also reported having been off of her medications for several weeks. (*Id.*). Ms. Flynn noted that Claimant continued to receive emotional support from her daughter and sister. (Tr. at 606). Claimant informed Ms. Flynn that she had no interest in individual therapy and only wanted to start taking her medications again. (*Id.*). Ms. Flynn found that Claimant had the ability to control her bipolar symptoms by taking daily medications. (*Id.*). Claimant was diagnosed with bipolar disorder and assessed with a GAF score of 50. (Tr. at 603–04).

On January 30, 2009, Claimant returned to Dr. Whitmore's office for a follow-up appointment with complaints of left upper extremity neuropathy, numbness, and tingling. (Tr. at 585–86). Claimant also complained of generalized arthralgia and myalgia complaints. (Tr. at 585). According to Claimant, even when her grandchildren touched her lightly, she felt very sore and tender. (*Id.*). Further, Claimant stated that she had difficulty remembering to take her medication once a week. (*Id.*). Dr. Whitmore found that Claimant's facial neuropathy had resolved and encouraged Claimant to quit smoking because of her diabetes. (*Id.*). Dr. Whitmore hypothesized that Claimant's left

upper extremity neuropathy was likely a result of carpal tunnel syndrome. (*Id.*). With respect to Claimant's other complaints, Dr. Whitmore noted a history of generalized myalgia, reflux and dyspepsia, restless leg syndrome, and osteoporosis. (Tr. at 586). Dr. Whitmore noted that Claimant's bipolar disorder was managed by Prestera. (*Id.*). After the appointment, Dr. Whitmore completed a second routine abstract form at the request DDS. (Tr. at 580–84). Claimant now alleged disability on account of back pain, constant numbness in the left hand, and bipolar disorder. (Tr. at 580). Again, Dr. Whitmore found that Claimant's vision, hearing, speech, musculoskeletal system, neurological functioning, respiratory system, cardiovascular system, and digestive system were all normal. (Tr. at 581–83). Dr. Whitmore noted that Claimant was seen at Prestera for mental hygiene.  He offered no opinion regarding Claimant's ability to engage in work-related activities. (Tr. at 584).

On February 4, 2009, Claimant was admitted to the emergency room at Cabell Huntington Hospital with complaints of pleuritic chest pain. (Tr. at 646–56). Claimant explained that the onset of the chest pain was gradual and had persisted for four days. (Tr. at 646). An x-ray of Claimant's chest showed that her heart and lungs were within normal limits. (Tr. at 658). Claimant was diagnosed as suffering from pleurisy, chest wall pain, and a cough. (Tr. at 647). On February 11, 2009, Claimant visited Prestera for a pre-scheduled psychiatric review. (Tr. at 607). The treating physician noted that Claimant presented with depression and mood instability. (*Id.*). Her concentration, memory, and thought process were all found to be fair. (*Id.*).

On February 25, 2009, Claimant was seen by Mehmoodur Rasheed, MD, at Holzer Clinic on referral from Dr. Whitmore. (Tr. at 622–26). Claimant complained of generalized arthralgias and myalgias, particularly in her legs. (Tr. at 622). According to

Claimant, she had experienced joint and muscle pain for the past several years and the pain had increased in the last three to four months. (*Id.*). Claimant also reported numbness and tingling in her hands. (*Id.*). Dr. Rasheed noted that Claimant's motor strength was normal in all four extremities but that Claimant had some difficulty in raising her arms above her shoulder. (Tr. at 624). Dr. Rasheed stated that Claimant had all the tender points of fibromyalgia. (*Id.*). Based on his physical examination, Dr. Rasheed concluded that Claimant had localized primary osteoarthritis of the knee, rotator cuff tendonitis, possible carpal tunnel syndrome, and fibromyalgia. (*Id.*). An x-ray of Claimant's left shoulder revealed no acute fracture or dislocation and no soft tissue changes. (Tr. at 633). Claimant's subacromial space was well-maintained but there were moderate hypertrophic changes at the AC joint. (*Id.*). A subsequent x-ray of Claimant's lumbar spine taken on February 26, 2009 revealed no acute abnormalities, finding the vertebral height, alignment, and discs were well-maintained. (Tr. at 615).

On March, 4, 2009, Claimant returned to Holzer Clinic for a follow-up appointment with Dr. Rasheed. (Tr. at 634–37). Dr. Rasheed observed that Claimant's symptoms were basically unchanged. (Tr. at 634). He reviewed Claimant's x-rays and found that they showed AC joint arthritis on Claimant's left side. (*Id.*). Dr. Rasheed then examined Claimant's musculoskeletal system. (Tr. at 636). He found that Claimant continued to experience difficulty raising her arms above her shoulder and that she experienced impingement in her left shoulder. (*Id.*). Dr. Rasheed noted no swelling, warmth, redness, or tenderness of small joints of Claimant's hands. (*Id.*). Further, he found that Claimant had crepitus of both knees, but no effusion, synovitis, or tenderness of the knees. (*Id.*). Dr. Rasheed reiterated his earlier finding that Claimant had all the signs of fibromyalgia. (*Id.*). In conclusion, Dr. Rasheed found that Claimant had a

vitamin D deficiency; localized primary osteoarthritis of the shoulder; localized primary osteoarthritis of both knees; rotator cuff tendonitis of the left shoulder; and fibromyalgia. (*Id.*).

On March 12, 2009, Hascan Ercan, MD, performed a nerve conduction study on Claimant at Cabell Huntington Hospital. (Tr. at 640–41). Claimant reported numbness over her left hand and fingers except the thumb and also stated that she suffered from persistent neck pain. (Tr. at 640). Dr. Ercan found that the results of the study were abnormal with borderline ulnar neuropathy at the left elbow. (Tr. at 641). However, the study showed no evidence of cervical radiculopathy. (*Id.*).

On July 14, 2009, Claimant was examined by Scott R. Gibbs, MD, with complaints of hoarseness and a persistent cough. (Tr. at 687–88). Claimant reported that she felt a lump in her throat all the time. (Tr. at 687). Claimant also stated that she had decreased her smoking to about a pack to a pack and a half of cigarettes per day. (*Id.*). Dr. Gibbs performed a fiber optic laryngoscopy and found that Claimant appeared to have a cystic appearing lesion around the ventricle, which appeared to be a saccular cyst. (*Id.*). Based on his findings, Dr. Gibbs recommended surgery to remove the cyst and determine whether it was malignant. (Tr. at 688). On August 12, 2009, Dr. Gibbs performed a microsuspension laryngoscopy excision of Claimant's saccular cyst. (Tr. at 690–91). The surgical pathology report showed no dysplasia or malignancy in Claimant's removed cyst. (Tr. at 689). On September 1, 2009, Claimant returned to Dr. Gibbs' office for a follow-up appointment. (Tr. at 686). Dr. Gibbs found that Claimant was still experiencing voice disturbance and continued to suffer from tobacco use disorder. (*Id.*).

C.     **Agency Assessments**

1.     *Physical Assessments*

On November 6, 2008, Uma Reddy, MD, completed a Physical Residual Functional Capacity (RFC) Assessment at the request of the SSA. (Tr. at 541–48). Dr. Reddy found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk six hours a day, sit six hours a day, and was unlimited in her ability to push and pull. (Tr. at 542). Claimant's postural limitations included only occasionally climbing ladders, ropes, or scaffolds; stooping; kneeling; crouching; or crawling. (Tr. at 543). Dr. Reddy found that Claimant had no manipulative, visual, or communicative limitations. (Tr. at 544–45). Claimant's environmental limitations required the avoidance of concentrated exposure to vibration, extreme cold, extreme heat, and hazards such as machinery or heights. (Tr. at 545). Dr. Reddy commented that Claimant could perform light household chores and shop for groceries occasionally. (Tr. at 546). Claimant contended that she could not lift anything and was only able to walk for one block before needing to rest, but Dr. Reddy found these statements to be only partially credible. (*Id.*).

On April 16, 2009, A. Rafael Gomez, MD, completed a second RFC assessment at the request of the SSA. (Tr. at 673–80). He found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk six hours a day, sit six hours a day, and was unlimited in her ability to push and pull. (Tr. at 674). He felt Claimant was able to frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could only occasionally climb ladders, ropes, or scaffolds. (Tr. at 675). Dr. Gomez opined that Claimant had no manipulative, visual, or communicative limitations. (Tr. at 676–77). Her environmental limitations required the avoidance of concentrated exposure to

vibration and hazards such as machinery or heights. (Tr. at 677). Dr. Gomez documented that Claimant lived in a house with her family and assisted her daughter-in-law with housework. She cooked simple meals; drove her car; ran errands; managed her finances; read and watched television; talked to friends on the phone; and attended doctors' appointments as needed. (Tr. at 678). Claimant reported pain in her hands, back, legs, feet, and arms with difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and using her hands. (*Id.*). Dr. Gomez noted that Claimant had previously been evaluated by a state agency physician on November 6, 2008, and had been reduced to medium work. (*Id.*). At that time, Claimant's principal diagnosis was back pain and she was found to be partially credible. (*Id.*). Dr. Gomez opined that Claimant's main diagnosis was diabetes mellitus due to obesity level I and fibromyalgia. (Tr. at 678). However, Dr. Gomez concluded that there was no basis to change Claimant's RFC; thus, she could perform work within the medium exertional level.

On November 20, 2009,[3] Drew Apgar, DO, completed a disability evaluation at the request of the SSA. (Tr. at 701–25). Dr. Apgar examined Claimant and found her account of her medical history to be credible. (Tr. at 701). Claimant's request for disability was based on depression, bipolar disorder, chronic pain, fibromyalgia, asthma, and hoarseness. (Tr. at 702). Claimant provided a history of working for several employers as a CNA for periods ranging from two weeks to four months. (*Id.*). Claimant explained that she suffered from depression and bipolar disorder and had been

---

[3] Dr. Apgar transmitted his findings to the West Virginia Disability Determination Section on December 14, 2009.

admitted to Cabell Huntington Hospital in the past when she attempted suicide.[4] (*Id.*). According to Claimant, she suffered from chronic pain, including back pain that had persisted for over two years although she offered no medical history to explain the pain. (*Id.*). Claimant also complained of facial neuropathy but failed to provide any history of illness or injury that would logically trigger these symptoms. (*Id.*). Claimant further stated that she suffered from migraine headaches, GERD, dyspnea, and chronic hoarseness. (Tr. at 702–03). Dr. Apgar recorded his general observations of Claimant:

> Claimant appears her stated age. Claimant is able to get on and off examination table without difficulty. Claimant shows good posture while seated and while standing. Claimant is able to move about the room without difficulty, and [C]laimant is able to dress and undress without assistance.

(Tr. at 706). Next, Dr. Apgar found that Claimant suffered from chronic pain syndrome and fibromyalgia. (Tr. at 711). Specifically, Dr. Apgar found that Claimant experienced myofascial pain of the cervical and lumbar spine and nonspecific arthrosis of the joints. (*Id.*). Dr. Apgar next addressed Claimant's chronic obstructive pulmonary disease (COPD). (Tr. at 711–12). Dr. Apgar concluded that Claimant's COPD was mild and exacerbated by her chronic tobacco use. (*Id.*). Dr. Apgar also noted that Claimant suffered from hyperlipidemia, anxiety, depression, bipolar disorder, gastroesophageal reflux disease, and obesity. (Tr. at 712). Dr. Apgar then summarized his opinions. (Tr. at 712–13). Based on objective findings, Dr. Apgar concluded that Claimant would have no difficulty with standing, walking, sitting, lifting, carrying, pushing, pulling, handling objects with the dominant hand, hearing, speaking, or traveling. (Tr. at 713). Dr. Apgar stated that he considered Claimant's efforts during his examination to be unsatisfactory and that the results of her testing were considered to be suspect. (*Id.*). Further, Dr.

---

[4] The date of Claimant's alleged suicide attempt was not included in Dr. Apgar's report.

Apgar found that Claimant's mental status was "essentially normal despite past medical history." (*Id.*). Claimant's understanding and memory were found to be intact and she was able to maintain concentration and focus throughout Dr. Apgar's examination. (*Id.*). Dr. Apgar found that Claimant was capable of managing her benefits if awarded disability. (*Id.*).

Dr. Apgar also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. at 718–23). Dr. Apgar found that Claimant could lift up to 20 pounds continuously and up to 50 pounds frequently, but never lift anything above 50 pounds. (Tr. at 718). Next, Dr. Apgar addressed Claimant's ability to sit, stand, and walk. (Tr. at 719). Dr. Apgar found that Claimant could sit for two hours at a time without interruption; stand one hour at a time without interruption; and walk one hour at a time without interruption. (*Id.*). In an eight hour workday, Dr. Apgar concluded that Claimant could sit four hours, stand two hours, and walk two hours. (*Id.*). Dr. Apgar based these conclusions on his findings that Claimant did not have any range of motion restriction, strength deficits, or gait abnormalities. (*Id.*). Dr. Apgar further found that Claimant had no problems in using her hands or feet. (Tr. at 720). Dr. Apgar evaluated Claimant's postural activities and found that Claimant could continuously balance; frequently climb stairs, ramps, ladders, or scaffolds; and occasionally stoop, kneel, crouch, or crawl. (Tr. at 721). In regard to environmental limitations, Dr. Apgar opined that Claimant could continuously be exposed to moving mechanical parts or operating a motor vehicle; frequently be exposed to unprotected heights and loud noise (heavy traffic); and never be exposed to humidity, wetness, dusts, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations. (Tr. at 722–23). Dr. Apgar then evaluated Claimant's activities of daily living. (Tr. at 723). He noted that Claimant was

able to run errands; travel without assistance; ambulate without assistance; walk a block at a reasonable pace; use standard public transportation; climb steps with the use of a hand rail; prepare simple meals; perform personal hygiene; and sort, handle, and use paper files. (*Id.*).

      2.    *Mental Health Assessments*

On November 17, 2008, Lisa C. Tate, MA, completed a mental status examination for DDS. (Tr. at 550–554). Ms. Tate noted that Claimant had a normal gait and posture, good use of all limbs, and no vision, auditory, or speech problems. (Tr. at 550). Claimant's chief mental health complaints were bipolar disorder and depression. (Tr. at 551). Claimant stated that she had been diagnosed with bipolar disorder several years prior and was prescribed Paxil, which was not very effective at relieving her symptoms. (*Id.*). She described having mood swings, difficulty sleeping, and depression that had worsened over the past several years with related symptoms of low energy, social withdrawal, loss of appetite, and a loss of interest in activities. (*Id.*). Ms. Tate recorded Claimant's medical complaints of chronic back pain, an esophageal tumor, high cholestoral, and diabetes. (*Id.*). Claimant informed Ms. Tate that she smoked two packs of cigarettes a day and had been smoking since the age of 13. (Tr. at 551). With respect to her mental health treatment, Claimant reported a two-week admission to the Prestera Crisis Unit in 2004 or 2005. (Tr. at 552). She received no outpatient treatment following her discharge, although she later initiated treatment at Prestera and received psychotherapy for four to five months in 2007. (*Id.*). Claimant informed Ms. Tate that she earned her GED and eventually obtained a CNA license. (*Id.*). Ms. Tate reviewed Claimant's vocational background and noted that Claimant had worked as a CNA for two to three months before quitting in August 2008. (*Id.*). Previously, Claimant worked

as a floor associate at Wal-Mart, as a barber, and fast-food worker. (*Id.*).

Ms. Tate subsequently completed her mental status examination of Claimant. (Tr. at 553). Ms. Tate found that Claimant's orientation, affect, thought process, thought content, perception, insight, judgment, immediate memory, remote memory, and psychomotor behavior were all within normal limits. (*Id.*). However, Ms. Tate found that Claimant's recent memory and ability to concentrate were mildly deficient. (*Id.*). Ms. Tate diagnosed Claimant as suffering from a single severe episode of major depressive disorder and chronic anxiety. (*Id.*). Ms. Tate based her diagnosis of major depressive disorder with anxious feature on Claimant's descriptions of her loss of energy, social withdrawal, loss of appetite, loss of interest in activities, difficult sleeping, and difficulty sitting still. (*Id.*). With respect to her daily activities, Claimant stated that she had no set sleep schedule and that she otherwise did "nothing" on a daily basis. (*Id.*). When pressed by Ms. Tate, Claimant reported performing personal care, washing dishes, reading, playing on the computer, and listening to music. (Tr. at 553). Claimant also stated that in addition to going to the grocery store once a week, she cooked and did laundry several times a week. (*Id.*). Claimant also visited her mother once every other week. (*Id.*). Ms. Tate noted that Claimant denied having any interests or hobbies. (Tr. at 554) Claimant's social functioning, persistence, pace, and concentration were found to be within normal limits. (*Id.*). Ms. Tate concluded that Claimant was capable of managing her own benefits. (*Id.*).

On December 3, 2008, Jim Capage, Ph.D, completed a Psychiatric Review Technique (PRT) at the request of the SSA. (Tr. at 555–68). Dr. Capage concluded that Claimant suffered from an affective disorder that was not a severe impairment. (Tr. at 555). Specifically, Dr. Capage found that Claimant suffered from a single episode of

major depressive disorder. (Tr. at 558). Dr. Capage then analyzed Claimant's functional limitations under the Paragraph B criteria of the Listings. (Tr. at 565). He found that Claimant's restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace were all mild. (*Id.*). Further, Dr. Capage found that Claimant had not experienced any episodes of decompensation. (*Id.*). Dr. Capage determined that Claimant's impairments did not satisfy the Paragraph C criteria. (Tr. at 566). Dr. Capage concluded that Claimant's statements concerning her mental functioning were generally credible. (Tr. at 567). Further, Dr. Capage found that Claimant's activities of daily living were not significantly limited by her depression and that Claimant had no problems getting along with friends and neighbors. (*Id.*). Based on Claimant's Paragraph B criteria, Dr. Capage concluded that Claimant's mental impairments were not severe and that Claimant retained the capacity to sustain work-like activities. (*Id.*).

On March 31, 2009, Timothy Saar, Ph.D, performed a second PRT at the request of the SSA. (Tr. at 659–72). Dr. Saar found that Claimant's bipolar disorder and depression satisfied the criteria for an affective disorder. (Tr. at 662). Dr. Saar evaluated the Paragraph B criteria and assessed Claimant's functional limitations as a result of his mental impairments. (Tr. at 669). Claimant's restrictions of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace were all found to be mild. (*Id.*). Dr. Saar found that Claimant had experienced one or two episodes of decompensation, each of extended duration. (*Id.*). Further, Dr. Saar concluded that the evidence did not establish the presence of Paragraph C criteria. (Tr. at 670). Based on the evidence from Prestera, the mental status examination, the previous PRT, Dr. Saar found that Claimant was only

partially credible as the evidence did not support her claim. (Tr. at 671). Dr. Saar noted that all areas of Claimant's mental functioning were within normal limits or only mildly limited. (*Id.*). Therefore, he concluded that Claimant's impairment was not severe. (*Id.*).

On December 17, 2009, Penny O. Purdue, MA, performed a supplemental psychological evaluation at the request of the ALJ. (Tr. at 727–33). Claimant's mother drove her to the appointment. Ms. Purdue noted that Claimant's posture was unremarkable and that her gait was "somewhat slow." (Tr. at 727). Claimant's chief complaints were of chronic back pain and bipolar disorder. (*Id.*). Claimant reported that she was applying for benefits because she was in so much pain that she was unable to work. (*Id.*). According to Claimant, her disability onset date in 2008 was due to an increase in back pain while getting her CNA license. (*Id.*). Claimant stated that she had made no attempts to return to work since her alleged disability onset date. (*Id.*). Claimant was unable to lift or carry individuals as part of her work as a CNA and her mood deteriorated while working. (*Id.*). Ms. Perdue interviewed Claimant and recorded Claimant's presenting symptoms. (Tr. at 727). Claimant reported experiencing depression almost all day throughout the week. (*Id.*). According to Claimant, she experienced a depressed mood, a lack of interest in daily activities, a poor appetite, poor concentration, feelings of hopelessness, and suicidal ideation without intent. (*Id.*). Claimant stated that her depression had increased in severity over the past several years and was exacerbated by her physical impairments. (*Id.*). Claimant also informed Ms. Perdue that she suffered from bipolar disorder. (*Id.*). Claimant also described experiencing anxiety attacks that resulted in an accelerated heart rate, shortness of breath, and dizziness. (Tr. at 728). Ms. Perdue recorded Claimant's history of arthritis, back and tailbone pain, fibromyalgia, hyperlipidemia, sciatica, and diabetes. (*Id.*). Ms.

Perdue found that Claimant's social functioning, speech, affect, thought process, thought content, perception, insight, immediate memory, and concentration were all within normal limits. (Tr. at 729). In contrast, Ms. Perdue found that Claimant's judgment, recent memory, and remote memory were all deficient. (*Id.*). Claimant's psychomotor activity exhibited various "pain behaviors" during the evaluation, including shifting of weight, grimacing, and heavy sighing. (*Id.*).

Next, Ms. Perdue completed an intellectual assessment of Claimant. Claimant scored a 78 on the verbal IQ section of the assessment and an 81 on the performance IQ section of the assessment for a full scale IQ score of 78. (*Id.*). Ms. Perdue found that these results were valid because Claimant was cooperative and appeared to put forth adequate effort. (*Id.*). Ms. Perdue found that Claimant read at the 8th grade level; spelled at a 7.9 grade level; and performed math computations at the 4.6 grade level. (*Id.*). Ms. Perdue diagnosed Claimant with a single episode of Major Depressive Disorder and Borderline Intellectual Functioning. (Tr. at 730). Ms. Perdue then discussed Claimant's activities of daily living. Claimant described her typical day, stating that she spent her time: sleeping, laying in bed, reading, gambling on the Internet, and playing with her grandchildren. (*Id.*). Claimant reported that she was able to cook, clean, do the laundry, run errands, and perform personal care. (*Id.*). Claimant stated that her desire and ability to perform these activities was limited due to her alleged disability. (*Id.*). Further, Claimant reported that she used to enjoy fishing, camping, swimming, and crocheting but was now unable to enjoy these activities due to her physical impairments. (*Id.*). Based on her evaluation, Ms. Perdue found that Claimant's prognosis was poor but that Claimant would be competent to manage her finances if provided with benefits. (*Id.*).

Finally, Ms. Perdue completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. at 731). First, Ms. Perdue addressed Claimant's ability to understand, remember, and carry out instructions affected by her mental impairments. Ms. Perdue concluded that Claimant's ability to: understand and remember simple instructions; carry out simple instructions; and to make judgments on simple work-related decisions was mildly[5] limited by Claimant's mental impairment. (*Id.*). Ms. Perdue also found that Claimant's ability to: understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions was markedly[6] limited by Claimant's mental impairments. (*Id.*). Ms. Perdue stated that her findings were based on Claimant's diagnosis of Borderline Intellectual Functioning. (*Id.*). Next, Ms. Perdue discussed Claimant's ability to interact appropriately with supervisors, co-workers, and the public, as well as her ability to respond to changes in the routine work setting. (Tr. at 732). Ms. Perdue concluded that Claimant's ability to: interact appropriately with the public; interact appropriately with supervisors; interact appropriately with co-workers; and respond appropriately to usual work situations and to changes in a routine work setting was moderately[7] limited due to Claimant's mental impairments. (*Id.*). Ms. Perdue based her findings on Claimant's social anxiety and irritability. (*Id.*). Ms. Perdue further noted that Claimant's interaction with her was adequate but that Claimant's ability to interact with others may fluctuate with Claimant's pain levels. (*Id.*).

---

[5] A "mild" limitation is defined as "a slight limitation in this area, but the individual can generally function well." (Tr. at 731).

[6] A "marked" limitation is defined as "a serious limitation in this area. There is a substantial loss in the ability to effectively function." (Tr. at 731).

[7] A "moderate" limitation is defined as "more than a slight limitation in this area but the individual is still able to function satisfactorily."

## IV.  <u>Summary of ALJ's Findings</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about

the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § C.F.R. § 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act throughout June 30, 2010. (Tr. at 10, Finding No. 1). The ALJ then determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since July 1, 2008, the alleged onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of osteoporosis, obesity, and depression. (*Id.*, Finding No. 3). The ALJ considered Claimant's history of benign esophageal tumors, acid reflux, facial neuropathy, diabetes, and high cholesterol but found these medical impairments to be non-severe. (Tr. at 10–12).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 12, Finding No. 4). The ALJ then found that Claimant had the following RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift 20 pounds occasionally, and 10 pounds frequently; at one time without interruption she can sit for two hours, stand for one hour, can walk for one hour; total in an eight-hour day she can sit for four hours, stand two hours, and walk two hours; can frequently climb stairs and ramps, ladders or scaffolds; can occasionally stoop, kneel, crouch, or crawl; frequently able to work at unprotected heights; cannot work in humidity and wetness, dust, odors, fumes, and pulmonary irritants; cannot work in extreme cold or heat, or subjecting the body to vibration; can work in loud noises such as in heavy traffic noises; mild limitation (slight limitation but the individual can function well) in understanding and remembering simple instructions; carrying out simple instructions; and the ability to make judgments on simple work related decisions; she has a marked limitation (substantial loss in the ability to effectively function) in dealing with complex job instructions, and carrying out complex job instructions, and the ability to make judgments in complex work decisions; a moderate limitation (more than slight, but the individual is still able to function satisfactorily) in the ability to interact with the public, with supervisors, with coworkers, and respond appropriately to usual work situations and to changes in a routine work setting.

(Tr. at 13–14, Finding No. 5).

As a result, Claimant could not return to her past relevant employment. (Tr. at 20, Finding No. 6). The ALJ considered that Claimant was forty-five years old at the time of the alleged disability onset date, which qualified her as a "younger individual age 18-49." (*Id.*, Finding No. 7). She had a high school education and could communicate in English. (*Id.*, Finding No. 8). He noted that transferability of job skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of transferability of skills. (*Id.*, Finding No. 9). The ALJ then considered all of these factors and, relying upon the testimony of a vocational expert, determined that Claimant could perform jobs such as routing clerk, machine tender/operator, machine inspector, security monitor, and marker, all of which existed in significant numbers in the national and regional economy. (Tr. at 20–21, Finding No. 10). On this basis, the ALJ concluded

that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 21, Finding No. 11).

## V.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three challenges to the Commissioner's decision. First, Claimant contends that the ALJ's hypothetical questions to the vocational expert were inadequate. (Pl.'s Br. at 17). Second, Claimant argues that the ALJ's RFC assessment was internally contradictory and inconsistent with the definition of "light" work found in the social security regulations. (Pl.'s Br. at 18–19). Third, Claimant asserts that the ALJ erred in finding that she was capable of frequent climbing. (*Id.*).

## VI.   **Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are

rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered each of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.  Analysis

### A.    Improper Hypothetical

First, Claimant contends that the ALJ's hypothetical questions to the vocational expert were inadequate because they omitted significant limitations that were outlined in Claimant's RFC assessment. Citing *Walker v. Bowen*, Claimant emphasizes that a vocational expert's testimony "must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments." 889 F.2d 47, 50 (4th Cir. 1989). Accordingly to Claimant, the ALJ erroneously excluded from his questions the functional limitations which were identified by Dr. Apgar and included in the ALJ's written RFC finding. (Pl.'s Br. at 17). As a result, the hypothetical questions did not adequately reflect Claimant's RFC or sufficiently outline for the vocational expert the extent of Claimant's limitations.

The law is well-settled that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that contains a fair rendition of

the claimant's impairments. *Walker*, 889 F.2d at 50–51. ("[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities-presumably, he must study the evidence of record to reach the necessary level of familiarity"). Hypothetical questions may omit non-severe impairments, but must include those impairments that are designated as severe by the ALJ. *Benenate v. Schweiker,* 719 F.2d 291, 292 (8th Cir. 1983).

Having carefully reviewed the transcript of the administrative hearings, the Court concludes that Claimant's challenge is based upon a misreading or misunderstanding of the record. Claimant is correct that the ALJ's hypothetical questions at the first administrative hearing on October 29, 2009 did not reflect Dr. Apgar's findings. (Tr. at 32–55). What Claimant seemingly fails to appreciate is that the questions could not have contained Dr. Apgar's findings, because he had not yet performed his examination of Claimant. At the conclusion of the first administrative hearing, Claimant requested additional evaluation by consultative examiners. (Tr. at 53–54). The ALJ granted Claimant's request, and she was subsequently examined by Dr. Apgar on November 20, 2009, *a month after the first administrative hearing*. (Tr. at 701–25). A second administrative hearing was then conducted on February 25, 2010 for the sole purpose of considering and assimilating the supplemental findings of Dr. Apgar and Ms. Perdue, the psychological consultative examiner. (Tr. at 22–31). At this hearing, the ALJ's hypothetical questions to the vocational expert incorporated all of the restrictions found by Dr. Apgar, as well as additional and more significant limitations ascertained by the ALJ from a review of the record as a whole. Ultimately, the opinions given by the vocational expert were based upon hypothetical questions that mirrored the ALJ's detailed RFC assessment. Consequently, Claimant's argument is misguided and

factually insupportable.

Dr. Apgar found that Claimant could lift up to 20 pounds continuously; frequently lift up to 50 pounds; and never lift anything above 50 pounds. (Tr. at 718). Next, Dr. Apgar addressed Claimant's ability to sit, stand, and walk. (Tr. at 719). He found that Claimant could sit for two hours at a time without interruption; stand one hour at a time without interruption; and walk one hour at a time without interruption. (*Id.*). In an eight hour workday, Dr. Apgar concluded that Claimant could sit four hours, stand two hours, and walk two hours. (*Id.*). Dr. Apgar's findings also included numerous environmental limitations. At the supplemental hearing (Tr. at 22–31), the ALJ integrated these findings into his hypothetical questions to the vocational expert, stating:

> ALJ: All right. Now I would like you [the vocational expert] to assume the following limitations. Assume that the individual is able to frequently lift up to 50 pounds, but not over 50 pounds, can continuously lift up to 20 pounds. Assume that at one time, without interruption, the individual can sit for 2 hours, can stand for 1 hour, can walk for 1 hour. Assume that total in an 8 hour day, the individual is able to sit 4 hours, stand 2 hours, and walk 2 hours. Now if someone is able to continuously do a function in the use of hands and the feet, is that going to limit unskilled work at all?
>
> VE: No.
>
> ALJ: And would frequently limit unskilled work?
>
> VE: In certain jobs it would.
>
> ALJ: All right. So let's assume the individual can frequently climb stairs and ramps, ladders or scaffolds, can occasionally stoop, kneel, crouch or crawl. Assume the individual is frequently able to work at unprotected heights, but cannot work in humidity and wetness, in dust, odors, fumes and pulmonary irritants, extreme cold or heat[,] subjecting the body to vibration, but can work in loud noises such as in heavy traffic noises. Assume further that I find our hypothetical individual has a mild limitation defined as slight limitation, but the individual can function well in understanding and remembering simple instructions, carrying out simple instructions, and the ability to make judgments on simple work

related decisions. Assumed that there is a marked limitation that is substantial loss in the ability to effectively function, dealing with complex job instructions and carrying out complex job instructions, and the ability to make judgments in complex work decisions, a moderate limitation, which is defined as more than slight, but the individual is still able to function satisfactorily in the ability to interact with the public, with supervisors, with coworkers, and respond appropriately to usual work situations, and to changes in a routine work setting.

. . .

All right. With these limitations added to your vocational factors, assuming our hypothetical person is the claimant's age, education, and work background, in your opinion, would there be a significant number of jobs in the regional or national economy such a person could perform?

VE: Yes.

ALJ: And what – I take it medium work would be eliminated by those postural limitations I've given you.

VE: That's correct.

ALJ: So let's limit the lifting, then, to 20 pounds occasionally, 10 pounds frequently. And what percentage of the light and sedentary unskilled jobs would be available?

(Tr. at 25–26). As stated, the ALJ's hypothetical questions closely tracked his written

RFC finding.[8] Accordingly, the ALJ accurately presented all of Claimant's severe

---

[8] The ALJ's RFC finding reads as follows:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift 20 pounds occasionally, and 10 pounds frequently; at one time without interruption she can sit for two hours, stand for one hour, can walk for one hour; total in an eight-hour day she can sit for four hours, stand two hours, and walk two hours; can frequently climb stairs and ramps, ladders or scaffolds; can occasionally stoop, kneel, crouch, or crawl; frequently able to work at unprotected heights; cannot work in humidity and wetness, dust, odors, fumes, and pulmonary irritants; cannot work in extreme cold or heat, or subjecting the body to vibration; can work in loud noises such as in heavy traffic noises; mild limitation (slight limitation but the individual can function well) in understanding and remembering simple instructions; carrying out simple instructions; and the ability to make judgments on simple work related decisions; she has a marked limitation (substantial loss in the ability to effectively function) in dealing with complex job instructions, and carrying out complex job instructions, and the ability to make judgments in complex work decisions; a moderate limitation (more than slight, but the individual is still able to function satisfactorily) in the ability to interact with the public, with supervisors, with coworkers, and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 13–14, Finding No. 5).

- 33 -

impairments in the hypothetical questions given to the vocational expert; thus, Claimant's challenge is without merit.

### B.     RFC Finding that Claimant was Capable of "Light" Work

Next, Claimant contests the determination that she is capable of light level work, arguing that the functional restrictions contained in the ALJ's RFC assessment preclude the performance of light work as it is defined in the social security regulations. (Pl.'s Br. at 18). Citing to 20 CFR § 404.1567(b), Claimant argues that light exertional work requires an individual to perform a great deal of walking, standing, or sitting. Inasmuch as the ALJ found that Claimant "was limited to 2 hours of walking in an 8 hour day and 2 hours of [standing] in an 8 hour day" and "her ability to sit is limited to 4 hours in an 8 hour day," Claimant is not physically capable of meeting the exertional requirements of light level occupations. Thus, Claimant contends, the ALJ's contradictory and inexplicable determination that Claimant could perform light exertional work is plainly erroneous and merits reversal or remand. Having carefully reviewed the ALJ's RFC finding and the evidence of record, the Court rejects Claimant's contention.

The United States Department of Labor, in the publication *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles (SCO)*, classified occupations as sedentary, light, medium, heavy, or very heavy based upon the degree of primary strength required to perform the occupations. SSR 83-14. The classifications were demarcated by the degree of strength used in three work positions (standing, walking, and sitting) and four worker movements of objects (lifting, carrying, pushing, and pulling). *Id.* The SSA adopted these exertional classifications for use by the ALJ at the fourth and five steps of the sequential evaluation process. SSR 96-8P. At the third step of the process, the ALJ must determine whether the claimant's impairments

meet or medically equal a listed impairment. If the impairments do not, the ALJ outlines the claimant's RFC by identifying her limitations, restrictions, and work-related abilities on a function-by-function basis. SSR 96-8P. Once this analysis is completed, the ALJ moves to the fourth step of the evaluation and considers whether the claimant can perform her past relevant work as it was actually performed by her. If not, it becomes necessary for the ALJ to assess claimant's ability to perform her past relevant work as it is generally performed in the national economy. At this point, the ALJ may express the claimant's RFC in terms of a corresponding exertional level of work. *Id.* If the claimant cannot perform her prior relevant work, the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g); *See also*, *McLain*, 715 F.2d at 868-69. In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ( the "grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); *See also* 20 C.F.R. § 404.1569. The grids categorize jobs by their physical-exertion requirements; accordingly "[a]t step 5 of the sequential evaluation process, RFC **must** be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do." SSR 96-8P. (emphasis added). However, the grids consider only the exertional component of a claimant's disability. 20 C.F.R. § 404.1569. For that reason, when a claimant has significant

nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* The ALJ must consult the grids to determine whether a rule directs a finding of disability based on the strength requirement alone. If so, there is no need to assess the effects of nonexertional limitations. However, if the grids direct a finding of "not disabled" based on the strength requirement alone, then the ALJ cannot rely on the finding and, instead, must establish the availability of jobs through the testimony of a vocational expert. *Walker,* 889 F.2d at 49-50. Because the analysis subtly shifts at this step from an assessment of the claimant's limitations and capabilities to the identification of the claimant's potential occupational base, matching the appropriate exertional level to the claimant's RFC is the starting point. As the RFC is intended to reflect the **most** the claimant can do, rather than the least, the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-10. From there, the ALJ must determine whether the claimant's RFC permits her to perform the full range of work contemplated by the relevant exertional level. *Id.* "[I]n order for an individual to do a full range of work at a given exertional level ... the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." *Id.* If the claimant's combined exertional and nonexertional impairments allow her to perform many of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be    reduced to the extent that the claimant's restrictions and limitations prevent her from doing the full range of work

contemplated by the exertional level.

With this framework in mind, the Court considered the exertional level expressed by the ALJ in reference to Claimant's RFC. As stated *supra*, contrary to Claimant's argument, she need not be able to perform every occupation classified as light work in order for the ALJ to find her capable of substantial gainful activity within the light exertional classification. The social security regulations define light work as:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b). SSR 83-10 provides further clarification of light work, indicating that:

> Frequent means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

In the present case, the ALJ did not find Claimant capable of performing a full range of light work. Instead, the ALJ determined that Claimant had the physical strength to lift and carry 20 pounds occasionally and 10 pounds frequently, which meet the lifting/carrying requirements of light work, but he then *reduced the range of light*

*work* that Claimant could perform in view of her additional restrictions. (Tr. at 13–14). The ALJ properly included all of these limitations and restrictions in his hypothetical questions to the vocational expert. (Tr. at 25–26). With full attention given to Claimant's individualized RFC, the vocational expert found a significant number of jobs in the national and regional economy that Claimant could perform, opining that Claimant had the capability to perform approximately 15 percent of jobs available at the light level of work and 10-15 percent of jobs at the sedentary level of work. This testimony validated the ALJ's conclusion that occupations in the light exertional level were appropriate for Claimant despite her limitations and restrictions. (Tr. at 27-28).

The medical records provide further evidentiary support for the ALJ's finding that Claimant could perform a reduced range of light level work. Claimant's treating physician, Dr. Whitmore completed two physical evaluations of Claimant at the request of DDS and in both assessments found that Claimant's vision, hearing, speech, musculoskeletal system, neurological functioning, respiratory system, cardiovascular system, and digestive system were completely normal. (Tr. at 522–26, 580–84). He provided no opinion that Claimant's medical impairments significantly affected her ability to engage in substantial gainful activity. In addition, Dr. Apgar performed a thorough physical examination of Claimant, making detailed findings of her limitations. Dr. Apgar found Claimant capable of lifting and carrying as much as 20 pounds continuously and 21-50 pounds frequently; more than necessary to sustain light level work. (Tr. at 718). Similarly, Dr. Reddy determined that Claimant could frequently lift and carry up to 25 pounds; could occasionally lift and carry up to 50 pounds, and could sit, stand, and walk up to 6 hours each in an 8 hour workday. (Tr. at 542). Dr. Gomez made the same findings in his subsequent RFC assessment. (Tr. at 674). Accordingly,

the Court finds that the ALJ's RFC finding is entirely consistent with the social security regulations and rulings and is supported by substantial evidence.

### C.    Postural Limitations

Finally, Claimant alleges that the ALJ erroneously evaluated her ability to climb stairs, ramps, ladders, and scaffolds. (Pl.'s Br. at 19).  According to Claimant, SSR 83-14 sets forth a system to measure the functional severity of a claimant's impairments by examining the length of time the claimant can perform certain work-related activities.[9] (Pl.'s Br. at 19). A claimant can perform an activity "frequently" if she can engage in that activity from one-third to two-thirds of the workday. A claimant can perform an activity "occasionally" if she can engage in that activity up to one-third of a workday. Here, the ALJ found Claimant capable of sitting four hours, standing two hours, and walking two hours in an eight hour work day, but also found her capable of climbing stairs and ramps, ladders or scaffolds frequently. Claimant argues that based upon SSR 83-14, she can walk only "occasionally" because two hours is less than one-third of an eight hour work day. Thus, she logically can climb only occasionally, as well; rather than frequently as determined by the ALJ. Claimant's argument is a syllogism: Claimant can only walk *occasionally*; climbing stairs, ramps, ladders, or scaffolds requires walking; therefore, Claimant is incapable of climbing stairs, ramps, ladders or scaffolds *frequently*. (*Id.*). Claimant contends that the inherent incongruity in the ALJ's "walking" and "climbing" findings renders his decision unsound and requires its reversal or remand.

In response, the Commissioner argues that Claimant mistakenly "conflates climbing, a non-exertional postural limitation, with walking, an exertional limitation." (Def. Br. at 16). The Commissioner asserts that, in any case, the issue is irrelevant

---

[9] The system looks at whether the claimant can perform a particular activity "frequently," "occasionally," or "never."

because none of the jobs identified by the vocational expert required Claimant to frequently climb and most required no climbing at all. (*Id.* at 17). Having considered the arguments, the Court agrees with the Commissioner.

Superficially, Claimant's argument sounds reasonable. However, the social security regulations and rulings uncover the fundamental flaw in her argument. As pointed out by the Commissioner, exertional and nonexertional limitations differ in kind and measurement; hence, Claimant's comparison inevitably results in an invalid conclusion. SSR 83-13 clarifies the differences between exertional and nonexertional limitations, explaining:

> The term "exertional"[10] has the same meaning in the regulations as it has in the United States Department of Labor's publication, the *Dictionary of Occupational Titles* (DOT). In the DOT supplement, *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles* (SCO), occupations are classified as sedentary, light, medium, heavy, and very heavy according to the degree of primary strength requirements of the occupations. These consist of three work positions (standing, walking, and sitting) and four worker movements of objects (lifting, carrying, pushing, and pulling).
>
> Any functional or environmental job requirement which is not exertional is "nonexertional." In the disability programs, a nonexertional impairment is one which is medically determinable and causes a nonexertional limitation of function or an environmental restriction. Nonexertional impairments may or may not significantly narrow the range of work a person can do. In the SCO, where specific occupations have critical demands for certain physical activities, they are rated for climbing or balancing; stooping, kneeling, crouching or crawling; reaching, handling, fingering, or feeling; talking or hearing; and seeing. . .

*See also* SSR 98-6p (stating that "[n]onexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions. It assesses an individual's abilities to

---

[10] The DOT defined exertional as those abilities that affect a claimant's capability to meet the strength demands of certain jobs. *See also* 20 C.F.R. § 404.1569a.

perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision). In addition to these activities, it also considers the ability to tolerate various environmental factors (e.g., tolerance of temperature extremes).”). An exertional limitation manifests itself only when a claimant is exerting strength to meet the physical demands of a particular task. In contrast, a nonexertional limitation is present at all times in a claimant’s life, “whether during exertion or rest.” *Gory v. Schweicker,* 712 F.2d 929, 930 (4th Cir. 1983).

In the present case, the ALJ found only slight limitations in Claimant’s capacity to climb. To make that determination, the ALJ relied upon Dr. Apgar’s assessment of Claimant’s mechanical ability to posture her body for climbing, which is a consideration entirely unrelated to the question of whether Claimant had the strength to stand on her feet long enough to effectively climb. Accordingly, Claimant’s conclusion that the ALJ erred in finding greater limitations on her ability to stand than on her ability to climb is specious as its accuracy depends upon an incorrect presumption that the two findings are measurements of the same dynamic.

The ALJ’s finding related to Claimant’s ability to climb is supported by substantial evidence. Dr. Whitmore opined that Claimant’s gait and musculoskeletal system were normal. Dr. Apgar likewise found Claimant’s lower extremities to be without atrophy or neurological impairment; she had a full range of motion in her dorsolumbar spine, hips, knees, and ankles; her gait was normal, she had no redness, heat, thickening, effusion, swelling, deformity, or instability of her lower extremity joints; she could heel walk, toe walk, heel to toe walk, and squat halfway. (Tr. at 709-

717). The ALJ afforded these findings "great weight" in establishing Claimant's RFC. (Tr. at 19). Based on Dr. Apgar's findings, the ALJ concluded that Claimant was capable of sitting four hours, standing two hours, and walking two hours in an eight hour work day. (Tr. at 13). The ALJ then found that Claimant could frequently climb stairs and ramps, ladders or scaffolds. (Tr. at 14). At the supplemental hearing, the ALJ incorporated these findings into his hypothetical questions to the vocational expert. (Tr. at 25–26). Given Claimant's exertional (sit, stand, and walk) and nonexertional (ability to climb stairs, ramps, ladders, or scaffolds) limitations, the vocational expert concluded that there were still a significant number of jobs in the national and regional economy that Claimant could perform. (Tr. at 27–28). Based on the expert testimony, the ALJ agreed that a significant number of jobs remained available to Claimant. (Tr. at 20–21).

In any event, Claimant's ability to climb stairs, ramps, ladders, or scaffolds was ultimately irrelevant to the final decision because, as Respondent points out, "relatively few jobs in the national economy require ascending or descending ladders and scaffolding," (Resp.'s Br. at 16–17, citing SSR 83-14). This observation is particularly true in occupations classified at the light and sedentary exertional level. Once Claimant's exertional classification was identified, the ALJ considered whether the relevant occupational base was diminished by Claimant's nonexertional limitations. SSR 83-14. A nonexertional limitation may reduce the occupational base at all exertional levels or may have little to no effect on the occupational base of the relevant exertional level. SSR 83-14.[11] In this case, the ability to climb, even if severely limited, had little to no effect on the occupational base available to Claimant. The ALJ appreciated that Claimant had a

_____

[11] For example, restrictions on the ability to ascend or descend scaffolds likely has little effect on the unskilled light occupational base, while a visual impairment will likely reduce the occupational base at all exertional levels. SSR 83-14.

combination of exertional and nonexertional limitations. He appropriately sought the assistance of a vocational expert to analyze the effect of Claimant's combined impairments on the occupational base at the light and sedentary exertional levels. Based upon the expert's conclusions, the ALJ properly determined that Claimant could perform jobs such as routing clerk, machine tender/operator, machine inspector, security monitor, and marker, all of which existed in significant numbers in the national and regional economy. (Tr. at 20–21, Finding No. 10). As suspected, a review of these job titles in the Dictionary of Occupational Titles (DOT) reveals that none of these jobs requires Claimant to frequently climb stairs, ramps, ladders, or scaffolds. Therefore, the Court finds no error in the ALJ's findings and further finds that the Commissioner's decision is supported by substantial evidence.

## VIII. **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** February 22, 2012.

Cheryl A. Eifert
United States Magistrate Judge